Opinion
 

 JEFFERSON (Bernard), J.
 

 Plaintiffs Hartford Accident and Indemnity Company, a corporate insurer, and John W. Osborne, a used car dealer doing business as John W. Osborne Company, sought declaratory relief (Code Civ. Proc., § 1060) against named defendants concerning their respective obligations arising out of an automobile collision near Terminal Island, a collision which resulted in the death of Valerie Green.
 

 Named as defendants were El Karem Abdullah, also known as Thomas Moore, Colonel James Tucker, Irene Romero, Ruth Green, Ruth Green as guardian ad litem for her daughter, Valerie Green’s two children—Edward Dornell and Anthony Eugene Abram.
 

 Trial was by the court, sitting without a jury. Judgment was awarded the plaintiffs. Defendant Ruth Green, on her behalf and as guardian ad litem, has appealed.
 
 [1]
 

 On April 4, 1974, there occurred a three-car collision which generated the filing of two actions—a personal injury and wrongful death action and this action for declaratory relief. Defendant El Karem Abdullah (hereinafter, Abdullah), driving at high speed and without a driver’s license in his possession, a 1971 Cadillac owned by Osborne, hit the rear of the Romero vehicle and then collided head on with a vehicle driven by Valerie Green and in which Ruth Green was a passenger. Valerie Green was pronounced dead at the scene. The other parties, Ruth Green, Irene Romero and Colonel Tucker, were injured as a result of this collision.
 

 
 *85
 
 In the declaratory relief action, two basic issues were litigated below before the court sitting without a jury. The first was whether Abdullah was an insured driver within the meaning of the “Garage” policy which had been issued to the Osborne Company by plaintiff Hartford. The second issue was whether, in the personal injury and wrongful death actions, a cause of action at common law for negligent entrustment of a motor vehicle had been stated with respect to the Osborne Company.
 

 In its findings of fact and conclusions of law, the trial court found that Abdullah was not an insured of Hartford, because he was not a “permissive user” of Osborne’s Cadillac; the trial court further found that Osborne had not been negligent in entrusting the Cadillac to Abdullah, and thus was not liable for the death and injuries caused by him while he was operating the Cadillac. Thus, judgment was entered for plaintiffs.
 

 On this appeal, defendant Green challenges the determinations made below. Plaintiff insurer, Hartford, contends
 
 [2]
 
 that the only issue raised by defendant is the sufficiency of the evidence supporting the judgment, and claims that there is substantial evidence supporting it, so it must be upheld. We perceive, however, that the issue of the insurance coverage provided by Hartford is a question of law, dependent as it is upon proper interpretation of the language of the policy issued by Hartford in relation to the coverage required by Insurance Code section 11580.1.
 
 (Jordan
 
 v.
 
 Consolidated Mut. Ins. Co.
 
 (1976) 59 Cal.App.3d 26 [130 Cal.Rptr. 446].) We note that the facts adduced below were not in dispute; our additional concern, therefore, is whether or not more than one set of reasonable inferences could be derived from the uncontroverted facts.
 

 On Sunday, March 31, 1974, the Osborne Company was a used car dealership located in Signal Hill; it specialized in the sale of luxury used cars. On that day, an Osborne salesman named Haley (not a witness at trial) allowed Abdullah, a visitor to the Osborne lot, to test-drive a 1972 Cadillac Brougham. There was testimony at trial that the Osborne dealership had a veiy loose policy about allowing their vehicles to be taken off the lot and driven by prospective customers. The circumstances of the test driving of Osborne cars was determined on an ad hoc basis, depending on such factors as the extent of knowledge Osborne personnel had concerning the prospective customer; it was not uncommon for such
 
 *86
 
 individuals to desire to have the car in which they were interested checked by an outside mechanic or examined by a spouse. Cars were sometimes kept overnight for such a purpose. There was no testimony as to the terms and conditions the Osborne salesman communicated to Abdiillah concerning the Brougham’s return, but Abdullah did not return the car that Sunday. The police arrested Abdullah for outstanding traffic warrants while he was driving the Brougham, and impounded the car some 30 miles from the Osborne dealership. On Monday, April 1, 1974, Osborne’s manager, Fich, recovered the car by paying impounds and storage charges in the amount of $35 or $40.
 

 On Tuesday, April 2, 1974, Abdullah returned to the Osborne car lot at 10 a.m., driving a 1962 Chevrolet. He expressed the desire to test drive the Brougham again but manager Fich refused to allow it because of what had occurred on Sunday. Fich told Abdullah that he, Abdullah, was not “responsible,” and asked Abdullah to pay the recovery costs of the Brougham. Abdullah refused, but stayed on the premises for several hours, insisting that he be allowed to test drive an automobile. Abdullah indicated to Fich that he considered that Fich’s refusal was really due to the fact that Abdullah was a black Muslim and, that since others were allowed to test drive cars, Fich’s refusal constituted racial discrimination. Fich, a former police officer, argued with Abdullah on the car lot, and a Signal Hill police officer approached them, and asked Abdullah for identification. Abdullah complied with this request, and the officer left; so did Abdullah, declaring that he was going to get some friends and would return; he mentioned the possibility that Osborne property might be damaged if Abdullah was not allowed to test drive an Osborne car. Fich reacted to the threat by arming himself with a gun before Abdullah’s expected return.
 

 Early in the afternoon, Abdullah did return—alone—and stayed on the premises for several hours, seeking to persuade Fich to allow him to test drive a car. While apparently the argument was less heated than it had been in the morning, Abdullah’s position remained that he was the victim of discrimination.
 

 Throughout the day, these events had been observed by John Osborne, the owner of the car lot, but Osborne had allowed his manager to handle the situation. However, at about 4 p.m., Osborne saw that Fich was getting very irritated with Abdullah, and decided to intervene. Osborne knew what had happened to the Brougham on the previous Sunday, but
 
 *87
 
 spent 30 minutes talking to Abdullah, who referred again to discrimination and the possibility of taking legal action or other action against the Osborne Company. Abdullah declared that he merely wished to have the test car checked by a mechanic, at a location some eight blocks away.
 

 Abdullah had not exhibited signs of intoxication to either Fich or Osborne. In addition, Abdullah was neatly dressed. Osborne testified that he had doubted at the time whether Abdullah was actually able to purchase the Brougham but that he had not ruled out the possibility “100 percent.” In 1974, because of the recent energy crisis, sales of large luxury cars were moving slowly. Osborne was interested in selling cars, and was also anxious to end the confrontation with Abdullah.
 

 Finally, at approximately 4:30 p.m., Osborne gave Abdullah permission to test drive an automobile. No paperwork was involved. Osborne had obtained an address for Abdullah, but no one asked Abdullah if he possessed a valid driver’s license. Osborne and Abdullah agreed orally that Abdullah was to return the car by closing time, at 6 p.m., and that he was to take the car for the purpose of having it checked by a mechanic. No specific vehicle was mentioned, although Osborne assumed that he was permitting a test drive of the Brougham.
 

 Abdullah actually drove off the lot in a 1971 Cadillac, a car somewhat similar to the Brougham in color. Abdullah did not return at 6 p.m., the closing time, or at any time thereafter. At 7:30 p.m., Elkins, Osborne’s repossessor, went to Abdullah’s residence but did not find either Abdullah or the car. Elkins was not successful in locating Abdullah or the car the next day, either. No theft report was filed with the local police because the Osborne personnel were familiar with the local police policy not to act upon such a report for 72 hours, when the initial taking of an automobile was permissive. On April 4, 1974, two days after Abdullah drove away, the fatal collision occurred, some eight to ten miles from the Osborne lot.
 

 I
 

 Abdullah as an Insured
 

 By statute, California has long provided for liability of the owner of a vehicle to third persons for damages sustained by them as the result of negligent operation of the owner’s vehicle by a driver who has the
 
 *88
 
 owner’s consent to drive. Vehicle Code section 17150 declares that “[e]very owner of a motor vehicle is liable and responsible for death or injury to person or property resulting from a negligent or wrongful act or omission in the operation of the motor vehicle, in the business of the owner or otherwise, by any person using or operating the same with the permission, express or implied, of the owner.”
 

 The statute, as originally enacted, constituted a departure from liability recognized at common law, and has been interpreted in numerous cases as a statute subject to strict construction. The “permissive use” envisioned by the statute as a prerequisite for imposing liability on the vehicle owner has been considered to be that use expressly or impliedly within the scope of permission as to time, place and purpose, as granted by the owner. (See, e.g.,
 
 Henrietta
 
 v.
 
 Evans
 
 (1938) 10 Cal.2d 526 [75 P.2d 1051];
 
 Engstrom
 
 v.
 
 Auburn Auto. Sales Corp.
 
 (1938) 11 Cal.2d 64 [77 P.2d 1059];
 
 Blank
 
 v.
 
 Coffin
 
 (1942) 20 Cal.2d 457 [126 P.2d 868].) Occasionally a case has referred to an owner’s limitations on the permissive use as “secret restrictions” which could not insulate the owner from liability. (See, e.g.,
 
 Souza
 
 v.
 
 Corti
 
 (1943) 22 Cal.2d 454 [139 P.2d 645, 147 A.L.R. 861].)
 

 Insurance Code section 11580.1 makes it mandatory for policies of automobile liability insurance issued in this state to contain certain provisions, among which are those affording insurance “to the named insured with respect to any motor' vehicle covered by such policy, and to the same extent that insurance is afforded to the named insured, to any other person using, or legally responsible for the use of, such motor vehicle, provided such use is by the named insured or with his permission, express or implied, and within the scope of such permission, . . .” (Ins. Code, § 11580.1, subd. (b)(4).)
 

 The policy underlying section 11580.1 has long been identified as that of providing as much protection to the public on the highways of California as is possible.
 
 (Wildman
 
 v.
 
 Government Employees’ Ins. Co.
 
 (1957) 48 Cal.2d 31 [307 P.2d 359].) The “permissive user” coverage required in the section is a further reflection of this protective public policy, and is subject to liberal, broad construction to achieve that goal.
 
 (Metz
 
 v.
 
 Universal Underwriters Ins. Co.
 
 (1973) 10 Cal.3d 45, 50 [109 Cal.Rptr. 698, 513 P.2d 922].)
 

 Until 1970, section 11580.1 defined permissive use as “express or implied,” without reference to the
 
 scope
 
 of permission. “Within the scope
 
 *89
 
 of such permission” was added by the Legislature in 1970. In
 
 Jordan
 
 v.
 
 Consolidated Mut. Ins. Co., supra,
 
 59 Cal.App.3d 26, the issue was
 
 pre-1970
 
 permissive use coverage. The
 
 Jordan
 
 court reasoned that the permissive use which could trigger liability by the insurer was broader prior to the amendment than it was thereafter: the amendment “presumably bespeaks a legislative intent to change the meaning of the statute as it was previously worded. [Citations.] The change in language would indicate that, prior to 1970, the statutorily required omnibus clause would make a permissive user an additional insured even if his use or operation of the vehicle were
 
 not
 
 within the scope of the permission granted.”
 
 (Jordan, supra,
 
 59 Cal.App.3d 26, 41; italics added.)
 

 Thus, in
 
 Jordan,
 
 the insurer was held to have responsibility for actions of the negligent driver, but the decision clearly interprets the 1970 amendment as indicative of legislative intent to limit the use designation of “permissive” to those use situations in which the user is acting within the parameters set by the owner of the vehicle. It is the post-1970 section which applies to the case at bench.
 

 Here, the garage policy issued Osborne by Hartford contained, as a description of those “permissive users” insured under policy provisions, “any person while using, with the permission of the
 
 named insured,
 
 any
 
 automobile
 
 to which the insurance applies under the
 
 automobile hazard,
 
 provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, . . .” (Italics in original.)
 

 Our research has not revealed any definitive discussion save that in
 
 Jordan
 
 as to what is meant by “the scope of permission.”
 
 Jordan
 
 tells us that the courts have adopted various views of “permission” when required to determine “the effect of use of the insured vehicle by a permissive user in excess of permission given. . . . ‘[There is] (1) The liberal or so-called “initial permission” rule that if a person has permission to use an automobile in the first instance, any subsequent use while it remains in his possession though not within the contemplation of the parties is a permissive use within the terms of the omnibus clause; ... (2) the moderate or “minor deviation” rule that the permittee is covered under the omnibus clause so long as his deviation from the permissive use is minor in nature; . . . and (3) the strict or “conversion” rule that any deviation from the time, place or purpose specified by the person granting permission is sufficient to take the permittee outside
 
 *90
 
 coverage of the omnibus clause; . . .’ [Citations.] The only limitation on the ‘initial permission’ rule is that the subsequent use must not be equivalent to ‘theft or the like.’ [Citations.]”
 
 (Jordan, supra,
 
 59 Cal.App.3d 26, 37-38; fn. omitted.)
 

 Defendant contends that the circumstances of the present case support the inference that, because the Brougham vehicle had not been returned by Abdullah on the first occasion of test driving, Osborne was, by implication, conferring possession of the car upon Abdullah on the second occasion for an indefinite period of time. The trial judge rejected this argument as unreasonable, and we cannot substitute defendant’s suggested inference for that of the trial court unless the latter was unreasonable.
 

 The implication of the trial court’s findings was that Osborne had expressly limited the scope of permission when he let Abdullah take a vehicle off the lot. We need not decide which of the “permission rules” applies in California, as being closer to the expressed legislative intent of Insurance Code section 11580.1. Even under the “initial permission” rule, Abdullah’s continued possession of the Osborne Cadillac for two days after he had promised to return it more nearly resembles the situation of “theft or the like.” This was no minor deviation from the scope of permission: rather, it was a deviation of major proportions. The scope of permission had in fact been limited as to time, area and purpose, and had been violated by Abdullah completely. Since there was substantial evidence supporting the trial court’s determination that Abdullah was operating the vehicle without permission of Osborne at the time of the accident, we must uphold the conclusion that Abdullah was not an insured driver within the meaning of Hartford’s garage policy.
 

 II
 

 The Negligence of Osborne
 

 Defendants also raised at trial the issue of Osborne’s nonstatutoiy common law liability as a negligent entrustor of a motor vehicle. “The doctrine of ‘negligent entrustment’ is clearly distinguishable from the theory of Vicarious liability.’ Negligent entrustment is a common law liability doctrine. [Citation.] Conversely, the obligation of a lending owner of an automobile is one of statutory liability. [Citation.] An owner of an automobile may be independently negligent in entrusting it
 
 *91
 
 to an incompetent driver. [Citation.] California is one of several states which recognizes the liability of an automobile owner who has entrusted a car to an incompetent, reckless, or inexperienced
 
 driver, . .
 
 .”
 
 (Syah
 
 v.
 
 Johnson
 
 (1966) 247 Cal.App.2d 534, 538-539 [55 Cal.Rptr. 741] (italics in original); see also 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 650, p. 2929; Rest.2d Torts, §§ 308, 390.)
 

 It has been stated that in order to impose liability for negligent entrustment, the lending owner must know, or from facts known to him should know, that the entrustee driver was intoxicated, incompetent, or reckless.
 
 (Richards
 
 v.
 
 Stanley
 
 (1954) 43 Cal.2d 60, 65 [271 P.2d 23].) In
 
 Syah, supra,
 
 for example, the employer knew the employee driver was subject to fainting spells but permitted the employee to drive on the employer’s business; liability to plaintiff, injured when the employee’s momentary unconsciousness caused an accident, was imposed upon defendant employer.
 

 In
 
 Owens
 
 v.
 
 Carmichael’s U-Drive Autos, Inc.
 
 (1931) 116 Cal.App. 348, 350 [2 P.2d 580], the court declared that “[s]uch negligence is most frequently predicated upon the fact that an owner knowingly entrusts his car to an incompetent person, but we do not believe that the owner is liable solely in those cases where such showing is made. The charge being that of negligence, the standard by which the conduct of the owner is to be measured is the general one based upon the care which an ordinarily prudent person would exercise under similar circumstances . ...” In
 
 Owens,
 
 pleadings were before the appellate court which disclosed that the defendant had rented a vehicle to an individual who had shown a temporary permit to drive; that shortly after taking possession of the vehicle, the driver had negligently injured the plaintiff. The
 
 Owens
 
 court reversed a judgment for defendant, and held that whether defendant had exercised due care under the circumstances was a question for the jury; the court regarded the entrustee’s lack of an operator’s license as a circumstance to be considered by the jury, stating that an operator’s license “is in effect a certificate evidencing the fact that the holder has demonstrated his competency.”
 
 (Id.,
 
 at p. 352.)
 

 We agree with the
 
 Owens
 
 court that the issue of whether an automobile lender has made a negligent entrustment of his vehicle is more properly resolved by application of general principles of negligence. TTie most important general principle is contained in Civil Code section 1714, which provides, in part pertinent to the issue before us, that “[e]veryone is
 
 *92
 
 responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill. . . .”
 

 We next consider what constitutes “ordinary care or skill” on the part of a used car dealership which routinely entrusts automobiles to individuals it may know very little about. Two sections of the Vehicle Code are pertinent here in suggesting the standard of care required in this circumstance.
 

 Vehicle Code section 14606 provides, in part, that “[n]o person shall . . . knowingly permit or authorize the driving of a motor vehicle, owned by him or under his control, upon the highways by any person unless the person is then licensed .for the appropriate class of vehicle to be driven. . . .” It has been stated that “ ‘[violation of [this] statute by the owner makes out a
 
 prima facie
 
 case against him in favor of a person who has sustained injury through the negligence of such unlicensed driver.’ [Citation.] ... It is then for the jury to determine under the circumstances whether the entrustor is negligent in permitting the unlicensed driver to operate the vehicle. [Citations.]”
 
 (Nault
 
 v.
 
 Smith
 
 (1961) 194 Cal.App.2d 257, 267-268 [14 Cal.Rptr. 889].)
 

 Vehicle Code section 14608 provides, in part, that “[n]o person shall rent a motor vehicle to another unless . . . [t]he person renting to another person has inspected the driver’s license of the person to whom the vehicle is to be rented and compared the signature thereon with the signature of such person written in his presence.”
 

 Taken together, these sections attempt to ensure that only licensed drivers will operate vehicles on the streets and highways in this state; the protected class are members of the public using those streets and highways. We think it clear that “ordinary care and skill” on the part of a used car dealer requires inquiry of persons wishing to test drive the dealer’s cars as to whether or not they are validly licensed drivers. Those persons who cannot produce a valid license to operate such automobiles test drive at the dealer’s peril.
 
 [3]
 

 
 *93
 
 In the case at bench, Osborne made no such inquiry of Abdullah, even though he
 
 knew
 
 that Abdullah had been arrested several days before for outstanding traffic warrants. At the scene of the fatal collision, the police discovered that Abdullah was driving without an operator’s license in his possession. We hold, therefore, that the undisputed facts support a finding of breach of the duty of care owed by Osborne to third persons, including the injured defendant Ruth Green and the children of the decedent, Valerie Green.
 

 It is elementary in negligence actions that the breach of duty must be a proximate cause of the injury sustained.
 
 [4]
 
 It was stated in
 
 Vesely
 
 v.
 
 Sager
 
 (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151], that “an actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct.” This principle was reiterated in
 
 Weirum
 
 v.
 
 RKO General, Inc.
 
 (1975) 15 Cal.3d 40, 47 [123 Cal.Rptr. 468, 539 P.2d 36]: “If the likelihood that a third person may react in a particular manner is a hazard which makes the actor negligent, such reaction whether innocent or negligent does not prevent the actor from being liable for the harm caused thereby. . . . Liability is imposed only if the risk of harm resulting from the act is deemed unreasonable—i.e., if the gravity and likelihood of danger outweigh the utility of the conduct involved.”
 

 The case of
 
 Enders
 
 v.
 
 Apcoa, Inc.
 
 (1976) 55 Cal.App.3d 897 [127 Cal.Rptr. 751], illustrates the present approach to proximate cause. Defendant parking lot operator parked vehicles with the keys in the ignition. A thief stole such a vehicle and, driving recklessly, injured plaintiff. The case was reviewed in the context of summary judgment proceedings below, which had resulted in judgment for defendant parking lot operator. The judgment was reversed; the
 
 Enders
 
 court found it foreseeable that not only would a thief take an automobile from the lot, but that the thief would thereafter drive recklessly.
 

 
 *94
 
 The casual transfer of possession of a vehicle—which occurred in the case at bench—may be equated to the carelessness of the parking lot operator in
 
 Enders,
 
 and it was equally foreseeable that Abdullah, like the thief in
 
 Enders,
 
 would drive in an irresponsible fashion. We find the view expressed in
 
 Dillon
 
 v.
 
 Legg
 
 (1968) 68 Cal.2d 728, 742 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], that “[i]n short, ‘each case must be considered on its own facts to determine whether the [situation] in toto justifies the conclusion that the foreseeable risk of harm imposed is unreasonable, and that the defendant owner or one in charge of a vehicle has a duty to third persons in the class of the plaintiffs to refrain from subjecting them to such risk.’ [Citations.]”
 

 In assessing the unreasonableness of the risk, one factor present in both
 
 Enders
 
 and the case at bench warrants discussion: both cases involved entities doing a volume business in motor vehicles with resultant heavy exposure on the part of the public to the risk involved. (3c) We do not consider it unreasonable to require that such entities take adequate precautions with respect to the vehicles owned by them or in their temporary custody. One such precaution involves requiring the production of evidence from a prospective user of competency to drive. A valid operator’s license, in the absence of other factors, is such evidence in a transaction contemplating the transfer of possession of an owner’s vehicle to another person about whom little is known. The standard of care required appears to comport most reasonably with resolution of the continuous problem of risk-spreading in a society based upon automobile use. We hold, therefore, that the reasonable inferences from the record before us support imposition of liability for negligence on the Osborne Company.
 

 The judgment is affirmed with respect to plaintiff Hartford. The judgment is reversed with respect to plaintiff Osborne, and the trial court is instructed to enter judgment in favor of defendant Ruth Green and defendant Ruth Green as guardian ad litem for the Abram children and against plaintiff Osborne.
 

 Plaintiffs shall bear all costs on appeal.
 

 Kingsley, Acting P. J., and Alarcon, J., concurred.
 

 [1]
 

 The notice of appeal, dated June 24, 1977, specifies that the appeal is taken from “the Court Order made herein on May 5, 1977,” referring to the court’s minute order of that date. That order is not an appealable order. Our record shows that judgment in this matter was entered June 6, 1977. We treat the appeal as having been taken, in timely fashion, from the judgment. We note also that none of the pleadings involved here have been designated as part of the record on appeal. We have summarized the facts by examining the designated exhibits (including the police report, which was admitted into evidence), and the reporter’s transcript.
 

 [2]
 

 Plaintiff insurer has filed a brief which indicates on its face that appellate counsel is representing the insurer in this court. While plaintiff’s brief purports to defend the judgment on both grounds, no brief has been filed on behalf of Osborne.
 

 [3]
 

 Failure to inquire concerning competency is closely akin to the situation in
 
 Murray
 
 v.
 
 Wright
 
 (1958) 166 Cal.App.2d 589, 591 [333 P.2d 111], where a used car dealer routinely left vehicles for sale on the lot unattended and with keys in the ignition, and actively encouraged members of the general public “without regard for the fitness or competence of said general public” to test drive the vehicles.
 
 Held,
 
 a cause of action in negligence stated by a plaintiff injured when a less than sober member of the general public got behind the wheel of one of the vehicles in question.
 

 [4]
 

 As may be seen by review of the annotation in 69 A.L.R.2d at page 978, some courts have not been able to ascertain any logical connection between breach of the requirement that the prospective user of the vehicle show competency by producing a valid operator’s license and any harm caused by a subsequent accident. In California, however, the Vehicle Code sections prohibiting vehicle use by presently unlicensed drivers have been recognized as expressions of public policy to provide protection to members of the public
 
 (Shifflette
 
 v.
 
 Walkup Drayage etc. Co.
 
 (1946) 74 Cal.App.2d 903 [169 P.2d 996]) and this circumstance strongly supports the view that evasion of the public policy requirement logically results in public injury, making the injury a proximate result of the breach.