[No. S130717. Dec. 7, 2006.]

PHILADELPHIA INDEMNITY INSURANCE COMPANY, Plaintiff and Respondent, v.
BLANCA MONTES-HARRIS et al., Defendants and Appellants.

152

**COUNSEL**

Hindin & Abel, Robert Marc Hindin, Bruce David Abel, Snow Tuyet Vuong and Douglas William Davis for Defendants and Appellants Blanca Montes-Harris et al.

Law Offices of David R. Denis, David Robert Denis and M. Michael Saint-George for Defendant and Appellant Javier Cortez.

Greenspan, Glasser & Rosson, David M. Glasser; Conner & Winters, James E. Green, Jr., and Julia Forrester-Sellers for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—Pursuant to rule 29.8 of the California Rules of Court, we granted the request of the United States Court of Appeals for the Ninth

Circuit for a decision addressing the following question: Does the duty of an insurer to investigate the insurability of an insured, as recognized by the California Supreme Court in *Barrera v. State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659 [79 Cal.Rptr. 106, 456 P.2d 674] (*Barrera*), apply to an automobile liability insurer that issues an excess liability insurance policy in the context of a rental car transaction?

Subject to our reservation of the specific question whether the *Barrera* duty to investigate insurability applies, as a general matter, to automobile insurers issuing excess liability insurance, we conclude that where, as here, the sale of excess liability insurance in a rental car transaction occurs after the rental car customer presents a facially valid driver's license and after the license inspection and signature verification requirements of Vehicle Code section 14608, subdivision (b), have been met, the excess insurer has no obligation to conduct a further inquiry regarding the validity of the customer's driver's license. In such a situation, if the excess insurer acts promptly upon discovery that the customer's facially valid driver's license was in fact suspended, then the excess insurer does not forfeit any statutory or contractual right to rely on the customer's presentation of the invalid license as a basis for avoiding liability to third persons under the excess policy.

## Factual and Procedural Background

The relevant facts, as stated in the Ninth Circuit's formal order and from our own review of the record, are as follows.

In June 2001, an Arizona resident named Alric Burke rented a car in California from Budget Rent-A-Car (Budget). He presented what appeared to be a valid Arizona driver's license. Budget's rental agent made a photocopy of the license and asked Burke to sign the rental agreement.

At the time of the rental transaction, Philadelphia Indemnity Insurance Company (Philadelphia) had issued a master excess policy of supplemental liability insurance that provided $1 million in third party liability coverage, in excess of the minimum statutory amounts of $15,000 per person and $30,000 per occurrence for bodily injury required under the financial responsibility law (Veh. Code,[1] § 16000 et seq.). That policy, to which we refer herein as an "excess liability policy" or "excess policy," identified Budget as the policy-holder. Budget, in turn, had authority under the excess policy to enroll its rental car customers under that policy as additional insureds, if the customers so opted, without submitting a written application to Philadelphia. Notably,

---

[1] All further unlabeled statutory references are to this code.

the excess policy excluded coverage for injury arising out of the use of a rental car obtained through fraud or misrepresentation.[2]

Here, Budget's rental agent found Burke qualified to rent a car after inspecting his driver's license, which appeared facially valid, and verifying his signature. The rental agent, then acting as an agent for Philadelphia for the limited purpose of offering and selling excess liability insurance, offered Burke the option of buying such insurance. Burke accepted the offer and purchased the excess insurance.

As it turned out, Arizona had suspended Burke's driver's license and driving privilege over two months earlier. Four days after renting the car, Burke was involved in a car accident in California that injured a number of people, including Javier Cortez, Blanca Montes-Harris, Monica Arredondo, and Camilla Toni Harris (the claimants). The claimants filed suit in state court against Budget and Burke to recover damages arising out of the accident.[3]

Meanwhile, Philadelphia commenced an action in federal district court, seeking a judgment declaring it had no liability for damages. A bench trial was held, and the district court determined, as part of its findings of fact and conclusions of law, that: (1) Burke made "at least a negligent misrepresentation" to Budget that he had a valid driver's license; and (2) the excess liability policy excluded coverage for rentals obtained through misrepresentation. Accordingly, the court declared Philadelphia had no liability for damages arising out of the accident.

The claimants filed an application for relief from the district court judgment. They requested relief on the basis of *Barrera, supra*, 71 Cal.2d 659, and *United Services Automobile Assn. v. Pegos* (2003) 107 Cal.App.4th 392 [131 Cal.Rptr.2d 866] (*Pegos*), which together establish that an automobile liability insurer has a nondelegable duty to undertake a reasonable investigation of insurability within a reasonable period of time of the issuance of a policy in order to preserve the ability to rescind the policy based on the insured's misrepresentations and thereby avoid liability on the policy to a third person whom the insured injures. The district court denied the application, and the claimants appealed.

---

[2] In a section entitled "EXCLUSIONS," the policy provided: "This insurance does not apply to any of the following: [¶] 1. 'Bodily injury' or property damage arising out of the use, or permitting the use, of a 'rental vehicle': [¶] . . . [¶] c. That was obtained through fraud or misrepresentation."

[3] In its briefing on the merits and at oral argument, Philadelphia made an undisputed representation that Budget has already provided or offered the claimants with the minimum coverage amounts required under the financial responsibility law.

The Ninth Circuit filed an order requesting that this court address whether *Barrera*'s recognition of a duty on the part of an insurer to investigate insurability applies to an excess insurer in the context of a rental car transaction.

## DISCUSSION

■ In California, the Insurance Code has long provided that either party to a contract of insurance may rescind on the basis of the other's misrepresentation. "If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false." (Ins. Code, § 359, added by Stats. 1935, ch. 145, p. 506; see also Ins. Code, § 331 [same remedy for concealment].) Moreover, the injured party may rescind, even though the misstatements "were the result of negligence, or, indeed, the product of innocence." (*Barrera, supra,* 71 Cal.2d at pp. 665–666, fn. 4; see *Telford v. New York Life Ins. Co.* (1937) 9 Cal.2d 103, 105 [69 P.2d 835]; see also Ins. Code, § 331 [same in concealment context].) When an insurer opts to rescind a liability policy on this basis, and does so in conformity with all of the requirements imposed by law (e.g., Ins. Code, § 650), the insurer generally may avoid liability on the policy to the insured or to any third party injured by the insured.

Our decision in *Barrera, supra,* 71 Cal.2d 659, a case that did not involve a rental car transaction, held that public policy considerations warrant an important qualification on an insurer's right to rescind in the context of automobile liability insurance. As explained more fully below, *Barrera* recognized that an automobile liability insurer has a duty to reasonably and timely investigate the insurability of its insured, and that the insurer cannot take advantage of a breach of that duty in order to avoid liability on a policy to an innocent victim of the insured.

Before proceeding to *Barrera*'s analysis, we acknowledge the insurer's contention here that it is not seeking rescission of a policy based on the insured's misrepresentation. Rather, Philadelphia claims, it seeks to enforce a policy clause that excludes coverage for injuries arising out of the use of a car rental obtained through fraud or misrepresentation.[4] (See *ante,* fn. 2.) While that distinction may carry weight in other contexts, it is not determinative here. Were we to conclude, as a matter of substantive law, that an excess liability insurer has a duty to investigate the insurability of a rental car

---

[4] Although the claimants contend Philadelphia is seeking rescission, the district court determined Philadelphia was not liable for damages arising out of Burke's accident after finding that the excess policy excluded coverage for rentals obtained through misrepresentation or fraud.

customer, such a duty could not be " ' "circumvented, defeated, or modified by any provision which the insurer may have elected to place in its contract in derogation of or in conflict therewith." ' " (*Metz v. Universal Underwriters Ins. Co.* (1973) 10 Cal.3d 45, 52, fn. 7 [109 Cal.Rptr. 698, 513 P.2d 922], quoting *Wildman v. Government Employees' Ins. Co.* (1957) 48 Cal.2d 31, 39 [307 P.2d 359].)

In *Barrera*, the plaintiff had previously obtained a judgment for damages caused by a negligent driver. When she sued the driver's automobile liability insurer to compel payment of that judgment, the insurer filed a cross-complaint seeking a declaration that the insurance policy it had issued was void *ab initio*. The trial court entered judgment for the insurer on both the complaint and the cross-complaint, finding rescission of the insurance policy justified because: (1) the insurer had issued the policy in reliance on a material misrepresentation made by the insured; and (2) the insurer acted promptly to rescind upon discovery of the insured's misrepresentation. (*Barrera, supra,* 71 Cal.2d at p. 662.)

In reversing that judgment, *Barrera* declared: "We conclude that an automobile liability insurer must undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and the issuance of a policy. This duty directly inures to the benefit of third persons injured by the insured. Such an injured party, who has obtained an unsatisfied judgment against the insured, may properly proceed against the insurer; the insurer cannot then successfully defend upon the ground of its own failure reasonably to investigate the application." (*Barrera, supra,* 71 Cal.2d at p. 663.)

*Barrera*'s recognition of this duty on the part of automobile liability insurers rested on a combination of three public policy considerations: the quasi-public nature of the insurance business generally; the public policy underlying the financial responsibility law (former § 16000 et seq., added by Stats. 1959, ch. 3, § 2, pp. 1523, 1635 et seq.; see now § 16000 et seq., added by Stats. 1974, ch. 1409, § 8, pp. 3095, 3096 et seq.); and the fact that such a duty is consistent with the extracontractual duty of all insurers to act promptly to accept or reject applications for insurance. These considerations are discussed below.

The first consideration *Barrera* addressed was the " 'quasi-public' " nature of the insurance business and the "insurer's role as a public service entity." (*Barrera, supra,* 71 Cal.2d at p. 669, italics omitted.) As *Barrera* observed, "the rights and obligations of the insurer cannot be determined solely on the basis of rules pertaining to private contracts negotiated by individual parties of relatively equal bargaining strength." (*Ibid.*) In this regard, "[t]he reasonable expectation of both the public and the insured is that the insurer will

duly perform its basic commitment: to provide insurance." (*Ibid.*) "With respect to an insurance policy voidable under the Insurance Code, if an automobile liability insurer can perpetually postpone the investigation of insurability and concurrently retain its right to rescind until the injured person secures a judgment against the insured and sues the carrier, then the insurer can accept compensation without running any risk whatsoever." (*Id.* at p. 670.) "Furthermore, under such a rule, the carrier would be permitted to deal with the insured as though he were insured, and thus to lead him to believe that he was in fact insured." (*Ibid.*)

*Barrera* next considered the public policy underlying the financial responsibility law. The decision observed that, unlike ordinary indemnity insurance, which primarily protects the insured, the law governing automobile liability insurance was enacted to protect the public, that is, such insurance represents protection "for those who suffer injury or death on the highway from financially irresponsible drivers." (*Barrera, supra,* 71 Cal.2d at p. 672.)

Mindful that the chief purpose of the financial responsibility law is to " 'provide compensation for those injured through no fault of their own' " *Barrera* sought to avoid a rule that, in practice, would (1) produce the "dangerous condition" that car owners and operators would drive with the erroneous belief they are insured, and (2) frustrate the expectation of those using the streets and highways that insurance companies would conduct their business in such a way as to fulfill, not thwart, the law's public policy purpose. (*Barrera, supra,* 71 Cal.2d at pp. 671–672.) The only way to meet this latter expectation, *Barrera* reasoned, was to recognize a duty on the part of automobile liability insurers to undertake a reasonable and timely investigation of insurability and to penalize breach of that duty by loss of the right to rescission. (*Id.* at pp. 672–673.)

Finally, *Barrera* concluded that a duty of investigation for automobile liability insurers would be consistent with a line of decisions imposing an extracontractual duty on *all* insurers to act promptly to accept or reject applications for insurance. (*Barrera, supra,* 71 Cal.2d at pp. 673–674 [citing cases involving life insurers and supplemental disability insurers, among others].) As in the prompt action context, *Barrera* noted, principles of fairness and sound business practice support such a duty where automobile liability insurance policies are concerned. (*Id.* at p. 674.)

In finding that these public policy considerations support a duty to reasonably and timely investigate insurability, *Barrera* emphasized the duty inures directly to the class of potential victims of the insured. Thus, when an automobile liability insurer "breaches that duty, it may not defeat recovery by the injured person, who has recovered a judgment against the insured, by

relying on an untimely attempt to rescind." (*Barrera, supra*, 71 Cal.2d at p. 675.) Significantly, however, the insurer, upon satisfying such a judgment, retains a right to either prosecute a cause of action against the insured for damages for the latter's misrepresentations, or rely on the misrepresentations as a defense in any action by the insured. (*Id.* at p. 681; see *Pegos, supra*, 107 Cal.App.4th at p. 395, fn. 1.)

■ *Barrera* concluded by reversing the judgment and remanding the matter for further proceedings. *Barrera* explained that, ordinarily, it is a question of fact whether or not an insurer breaches its duty to reasonably and timely investigate insurability. (*Barrera, supra*, 71 Cal.2d at p. 681.) In that case, the reasonableness of the defendant insurer's failure to investigate the insured's driving record would depend on various factors, including: (1) the cost of obtaining that information from the Department of Motor Vehicles (DMV); (2) the availability of that information from the DMV or elsewhere; (3) the general administrative burden of making such an investigation; and (4) whether the defendant insurer had a practice of delaying investigation until the presentation of a significant claim on the insurance policy. (*Id.* at p. 682 & fn. 17.)

Here, there is a disagreement over whether, as in the *Barrera* case, the insurer should have an obligation to investigate insurability. Philadelphia argues that the public policy underlying the financial responsibility law is to protect those who use the highways and streets by requiring minimum liability coverage of $15,000 per person and $30,000 per accident for bodily injury or death, and $5,000 per accident for property damage (§ 16056), and that this public policy does not support application of the *Barrera* rule to insurers that sell supplemental liability insurance in excess of those mandated statutory amounts. In support of this position, Philadelphia asserts that the Legislature enacted a provision allowing excess policies to contain exclusions that, if included in primary mandatory coverage policies, would be void as against public policy. (Ins. Code, § 11580.1, subd. (a).) Philadelphia further argues that, in the context of excess insurance sold as part of a rental car transaction, compliance with the mandate of section 14608 to inspect the driver's license and verify the signature of a rental car customer should be deemed sufficient to satisfy any duty to investigate insurability regarding the validity of a customer's driver's license.

Conversely, the claimants argue that *Barrera* did not limit its holding to primary insurers that provide automobile liability insurance coverage in the minimum statutory amounts required by the financial responsibility law. In their view, *Barrera*'s reasoning concerning the public's reasonable expectation that insurers will perform their basic commitment to provide insurance is just as applicable to insurers such as Philadelphia that sell excess automobile

liability insurance. It is the claimants' position that, under *Barrera*, it would be unfair to allow excess insurers that did not reasonably investigate insurability to keep the money they received in payment for such coverage but to not compensate the people injured by the drivers they insure.

Whether excess automobile liability policies, as a general matter, warrant different treatment than automobile liability policies providing the minimum statutory coverage presents a difficult question that has significant implications for a wide range of cases beyond the rental car context, including long-term automobile leasing and long-term excess coverage for private automobile ownership and use. In this case, we decline to decide whether the *Barrera* duty to investigate insurability generally applies, or does not apply, to all excess automobile liability insurers. Rather, assuming for purposes of argument that the *Barrera* duty is generally applicable where excess insurance is concerned, we conclude Philadelphia did not breach that duty as a matter of law. Specifically, we hold that an insurer selling supplemental liability coverage in excess of the minimum statutory amounts, in the context of a rental transaction, does not forfeit any statutory or contractual right to rely on a rental car customer's misrepresentation in tendering a facially valid but suspended driver's license as a basis for avoiding liability under an excess policy, if there has been compliance with the mandate of section 14608 to inspect the driver's license and verify the signature of the customer.

■ As courts have long recognized, the statutory provisions addressing vehicle use by unlicensed drivers represent a legislatively expressed public policy to provide protection to members of the public upon the streets and highways. (*Hartford Accident & Indemnity Co. v. Abdullah* (1979) 94 Cal.App.3d 81, 93, fn. 4 [156 Cal.Rptr. 254]; see *Shifflette v. Walkup Drayage etc. Co.* (1946) 74 Cal.App.2d 903, 907 [169 P.2d 996].) In this regard, section 14604 prohibits an owner of a motor vehicle from knowingly allowing another person to drive its vehicle without first determining that the person possesses a valid and appropriate driver's license.[5] Section 14604 specifies, however, that "an owner is required only to make *a reasonable effort or inquiry*" in this determination and "is *not* required to inquire of the [DMV] whether the prospective driver possesses a valid driver's license." (§ 14604, subd. (a), italics added.) As relevant here, section 14604, subdivision (b),

---

[5] Section 14604 provides: "(a) No owner of a motor vehicle may knowingly allow another person to drive the vehicle upon a highway unless the owner determines that the person possesses a valid driver's license that authorizes the person to operate the vehicle. For purposes of this section, an owner is required only to make a reasonable effort or inquiry to determine whether the prospective driver possesses a valid driver's license before allowing him or her to operate the owner's vehicle. An owner is not required to inquire of the department whether the prospective driver possesses a valid driver's license. [¶] (b) A rental company is deemed to be in compliance with subdivision (a) if the company rents the vehicle in accordance with Sections 14608 and 14609."

further clarifies that a rental car company "is deemed to be in compliance" with the reasonable-effort-or-inquiry mandate of the foregoing provision if, before renting to a person, it visually inspects the person's driver's license and verifies the person's signature in accordance with section 14608.[6]

■ Significantly, the enactment of section 14604 in 1994 was part of an overall legislative effort to address the serious public safety danger posed by unlicensed drivers and drivers with suspended or revoked licenses.[7] Because section 14604 specifically addresses rental car situations, that provision is reasonably viewed as reflecting a legislative policy decision that, given the unique nature and operational constraints of the rental car business, compliance with the inspection duties set forth in section 14608, subdivision (b), is an appropriate safeguard against the problem of unlicensed drivers in the rental car context.[8] Thus, when an insurer makes its excess liability insurance available to a rental car customer only after the rental car agent complies with the license inspection and signature verification requirements of section 14608, subdivision (b), the excess insurer conducts its business in a manner that is fully consistent with what the Legislature views as a "reasonable effort or inquiry to determine whether the prospective driver possesses a valid driver's license" in the rental car context. (§ 14604, subd. (a); see § 14604, subd. (b).)

At oral argument, we asked the claimants what additional investigation should be required of excess insurers to ferret out rental car customers whose driver's licenses appear facially valid but in fact are suspended or revoked. Although the claimants raised the possibility that rental car companies, as agents for excess insurers, could be equipped to perform license checks with the DMV, they acknowledged that allowing private companies access to DMV records may raise grave concerns about the privacy rights of rental customers, and also may cause congestion of DMV's computer systems and

---

[6] Section 14608 states in pertinent part: "No person shall rent a motor vehicle to another unless: [¶] (a) The person to whom the vehicle is rented is licensed under this code or is a nonresident who is licensed under the laws of the state or country of his or her residence. [¶] (b) The person renting to another person has inspected the driver's license of the person to whom the vehicle is to be rented and compared the signature thereon with the signature of that person written in his or her presence."

[7] In enacting section 14604, the Legislature considered estimates by the DMV that, at any given time, approximately 720,000 driver's licenses issued to Californians are suspended or revoked, that "75 percent of suspended/revoked drivers ignore the law and continue to drive illegally," and that these drivers are "four times as likely to be involved in a fatal accident as properly licensed drivers." (Assem. Com. on Transportation, analysis of Sen. Bill No. 1758 (1993–1994 Reg. Sess.) as amended June 21, 1994, p. 2.)

[8] Section 14604, subdivision (b), additionally requires rental car companies to maintain records of their rental car transactions in accordance with section 14609.

delay for rental car companies and their customers.[9] The claimants additionally suggested that rental car agents should affirmatively ask potential rental customers whether their driver's licenses have been suspended or revoked, and whether they have moved in the last year without notifying the DMV. They conceded, however, that such questioning might not be effective in those cases where, as here, a customer tenders a facially valid license that he or she knows or has reason to know has been suspended or revoked.

As Philadelphia points out, the Legislature surely is aware that rental car companies, as owners of vehicles, typically supply the mandatory financial responsibility law coverage as part of the rental transaction. Yet, armed with that knowledge, the Legislature has determined that a rental car company "is deemed to be in compliance" with the requirement that an owner make a reasonable effort or inquiry to determine whether a prospective driver possesses a valid driver's license if, before renting to a customer, it visually inspects the customer's driver's license and verifies the customer's signature in accordance with section 14608, subdivision (b), and also maintains records in accordance with section 14609. (§ 14604, subd. (b).) Because the Legislature has not seen fit to require DMV license checks or other specific investigatory measures on the part of an owner and typical provider of mandatory coverage in the rental car context, we shall decline to judicially impose such obligations on the offeror of optional excess coverage for purposes of preserving its rights to rescind an excess policy or invoke an exclusion clause based on a rental car customer's presentation of a facially valid but suspended driver's license. Moreover, while the Legislature might consider after this opinion whether further investigation should be required of a rental car company, and by extension an excess insurer, we remain mindful that the Legislature stands in the best position to identify and weigh the competing consumer, business, and public safety considerations that present themselves in the rental car context.

Here, there is no dispute that Budget's rental car agent, who acted as an agent for Philadelphia for the limited purpose of facilitating the excess insurance transaction, rented a car and offered the excess policy to Burke only after Burke presented a facially valid Arizona driver's license, and the agent inspected the license and verified Burke's signature in compliance with section 14608, subdivision (b). Under these circumstances, Philadelphia's failure to conduct a further inquiry into the validity of Burke's license did not result in a forfeiture of its contractual rights under the excess policy's exclusion for accidents caused by the use of a vehicle obtained through fraud or misrepresentation.

---

[9] We note the further concern that such factors, coupled with the costs of implementing such access, also may reduce the availability of excess liability insurance or deter its purchase.

CONCLUSION

■ We conclude that, where, as here, the sale of an excess policy of supplemental liability insurance in a rental car transaction occurs after the rental car customer presents a facially valid driver's license and after the license inspection and signature verification requirements of section 14608, subdivision (b), have been met, the excess insurer has no obligation to conduct a further inquiry regarding the validity of the customer's driver's license and does not forfeit any statutory or contractual right to rely on the customer's presentation of a facially valid but suspended license as a basis for avoiding liability to third persons under the excess policy. Put another way, if coverage under the excess policy is sold to a rental car customer in reasonable reliance on the rental car agent's inspection of the customer's driver's license and signature, and if the insurer acts promptly upon discovery of the customer's misrepresentation concerning the validity of the license presented, the insurer may be able to avoid liability on the excess policy to third parties injured by the customer.[10]

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

---

[10] In reaching this conclusion, we express no opinion as to whether other legal or equitable principles might or might not preclude enforcement of the exclusion clause in Philadelphia's policy.